**Earl A. CARSEY, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 20357.**

United States Court of Appeals District of Columbia Circuit.

Argued Sept. 29, 1967.

Decided Dec. 28, 1967.

Mr. Billy Dwight Perry, Washington, D. C., with whom Mr. Charles F. Wheatley, Jr., Washington, D. C., (both appointed by this court) was on the brief, for appellant.

Mr. Thomas Lumbard, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., Frank Q. Nebeker and Victor W. Caputy, Asst. U. S. Attys., were on the brief, for appellee. Mr. Theodore Wieseman, Asst. U. S. Atty., also entered an appearance for appellee.

Before EDGERTON, Senior Circuit Judge, and TAMM and LEVENTHAL, Circuit Judges:

EDGERTON, Senior Circuit Judge:

Appellant was tried four times for the murder of his wife. At the fourth trial he was convicted of second degree murder. This appeal is from that conviction.

At the first two trials the juries disagreed. At the third trial appellant's counsel, in his closing argument, told the jury that "the two previous trials have ended in mistrials." The prosecutor immediately objected and the judge said, "I will take care of it at the time of my charge." But instead of doing so, when the prosecutor on the following day pressed for a mistrial the judge granted it.

Defense counsel never informed the jury that the two previous juries had been unable to agree. But in the prosecutor's rebuttal argument, and again in his motion for a mistrial, he erroneously asserted that defense counsel had so informed the jury. Though defense counsel made timely objection to the motion for a mistrial, he did not point out the prosecutor's error.

Appellant petitioned, on the ground of former jeopardy, for a writ of prohibition against a fourth trial. This court denied the petition, but "without prejudice to renewal of the double jeopardy claim in any subsequent appeal which petitioner may take." At the beginning of the fourth trial, the defense of double jeopardy was pleaded and overruled. We think the District Court erred.

In Downum v. United States, 372 U.S. 734, 736, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963), the Supreme Court said: "At times the valued right of a defendant to have his trial completed by the particular tribunal summoned to sit in judgment on him may be subordinated to the public interest—*when there is an imperious necessity to do so*." (Emphasis added.) Notwithstanding the constitutional prohibition against double jeopardy, the Supreme Court has found sufficient necessity for a retrial when

a jury was unable to agree,[1] or a juror was biased,[2] or war conditions required postponement of a court-martial,[3] or a conviction was reversed either on direct appeal[4] or on collateral attack.[5] But repeated trials subject a defendant to serious hardship. In *Downum* the Supreme Court said, "We resolve any doubt in favor of the liberty of the citizen." 372 U.S. at 738, 83 S.Ct. at 1035.

■ There was no "imperious necessity" for the mistrial which the judge granted, over defense counsel's objection, at the third trial. That there had been previous mistrials did not mean that the juries had disagreed or that the prosecution's case was weak. From references made without objection during the third trial,[6] before defense counsel mentioned previous mistrials, the jury had learned that there had been at least one previous trial. The difference between one previous trial and two is not critical. Accordingly, defense counsel's mention of "mistrials" did not substantially prejudice the prosecution. Clearly, we think, it did not prevent a fair trial.[7] The trial judge should have handled the matter as he first proposed, through a cautionary instruction.

■ Both the prosecutor and defense counsel are charged with conducting themselves in accordance with the objective of a fair trial. It seems likely that this objective may be more easily imperiled by misconduct of the prosecutor than of the defense, since the jury may have special confidence in the prosecutor as a public official who does not represent a biased party but an impartial sovereign whose "interest * * * in a criminal prosecution is not that it shall win a case, but that justice shall be done."[8]

We need not consider whether the prosecutor would have been entitled to a mistrial if defense counsel, instead of the prosecutor, had given the jury the information that two earlier juries had been unable to agree. The prosecutor should certainly not benefit from prejudice which he himself has created.

■ We close with a suggestion in which Judge Tamm concurs. In retrials, references to previous trials are likely to be made. Such references may sometimes be prejudicial to the party who does not make them. We think the ultimate objective of a fair trial is most likely to be achieved if at the outset of a retrial the judge gives a cautionary instruction, as some judges in this circuit do, to the following effect: "The defendant has been tried before. [If there has been a mistrial, so state.] You have no concern with that. The law charges you to render a verdict solely on the evidence in this trial."

Reversed, and remanded with directions to dismiss the indictment.

LEVANTHAL, Circuit Judge (concurring):

I join in Judge Edgerton's opinion for the court. It lucidly sets forth the governing principles and their sound application to the facts of this case. This concurrence is appended to help

1. United States v. Perez, 9 Wheat. (22 U.S.) 579, 6 L.Ed. 165 (1824).

2. Simmons v. United States, 142 U.S. 148, 12 S.Ct. 171, 35 L.Ed. 968 (1891).

3. Wade v. Hunter, 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949).

4. United States v. Ball, 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896).

5. United States v. Tateo, 377 U.S. 463, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964).

6. At the *voir dire* one prospective juror stated in the presence of the others that her husband had "served on this case before." During the examination of one of the witnesses, portions of the transcript of the first trial were used in cross-examination, counsel referring to "previous testimony under oath, in this court." Another witness, in answer to a question, referred to "that trial."

7. See Foster v. United States, 308 F.2d 751, 753 (8th Cir. 1962).

8. Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); King v. United States, 125 U.S.App.D.C. 318, 372 F.2d 383 (1967).

avoid possible misunderstanding of our views concerning matters noted in the dissent. I hope its length will not alloy the force of the court's opinion.

I propose to draw further on the transcript to help dissipate any impression either that the court's ruling rests on a technicality, or that it places a premium on defense chicanery.

1. It scants the solemn trust of the courts to say that a case turns on technicalities when what is at stake is a fundamental secured by the Bill of Rights. The Fifth Amendment solemnly assures all of us that no person "shall be subject for the same offense to be twice put in jeopardy of life or limb."

The prohibition of the Double Jeopardy Clause is "not against being twice punished, but against being twice put in jeopardy."[1] It warns that "the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty."[2]

It is not necessary to show to what extent a particular defendant has been subjected to the evils that the Double Jeopardy Clause seeks to subdue. Yet it is interesting to note that this appellant has been confronted not only with the anxiety and ordeal that are virtually axiomatic for all retried defendants, but also with the need for proceeding in forma pauperis, presumably because of depletion of the funds that permitted him to retain counsel at the outset. By the time the mistrial was declared, appellant had been in jail more than nine months and had lived through 18 days of trial, spread over three proceedings and more than a year.

Appellant observed, among other things, how the Government witnesses came to drop from their testimony impressions favorable to defendant. Thus a key prosecution witness, the last person to see appellant and the deceased together, who began by testifying that they had acted that evening like newlyweds on a honeymoon, without an unfriendly word spoken, ended up by saying for the first time in four trials that the words between them had been "firm," and possibly harsh and "cross."[3]

1. United States v. Ball, 163 U.S. 662, 669, 16 S.Ct. 1192, 1194, 41 L.Ed. 300 (1896).

2. Green v. United States, 355 U.S. 184, 187–188, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957).

3. *First trial* (Tr. vol. 1, p. 88):
   Q. When you left the tavern, there had been no harsh word, no unfriendly word spoken between this couple?
   A. Not to my knowledge, no, sir.
   Q. They acted as the newlyweds which they were?
   A. Yes, sir.
   *Second trial* (p. 11):
   Q. * * * what was their relationship?
   A. As man and wife.
   Q. Were they friendly?
   A. Yes, sir.
   Q. Were they happy?
   A. Apparently so, appeared to be.
   Q. And their conversation was of that nature?
   A. Light, yes, sir.
   Q. Light, as honeymooners?
   COURT: As what?
   DEFENSE COUNSEL: As honeymooners.
   PROSECUTOR: Now what characterization of that, if your honor please.
   COURT: Was their relationship friendly, as that you would expect of a man and wife under favorable circumstances, sir?
   A. Yes, sir.
   Q. Did they fight or quarrel, at any time?
   A. No, sir.
   *Third trial.* (Tr. p. 49):
   Q. There was no harshness between the two that evening, was there?
   A. Not to my knowledge, no, sir.
   *Fourth trial* (Tr. 47, 60):
   Q. Isn't it a fact that Mr. and Mrs. Carsey at all times acted like honeymooners during the course of your presence with them?
   A. I don't know how honeymooners act all the time. They acted as man and wife.

We also note that the police officer who readily acquiesced in the two "hung jury" trials that appellant was "hysterical," later withheld that characterization.[4] This shift, though less dramatic, was by no means inconsequential in view of the significance of appellant's condition at the time he made a statement inconsistent with what he later told another officer.

In Downum v. United States,[5] the Supreme Court not only set forth the principle that the Double Jeopardy Clause assures the defendant a verdict from the jury that has been convened unless "imperious necessity" intervenes, but expressly ruled that this basic right must be held inviolate even though its infringement was due only to a prosecutor's mishap in announcing ready before assuring that his key witnesses were available, and even though the trial was delayed only two days.

There is no basis for supposing that the Supreme Court would trim this imperious necessity doctrine and permit the state to ask for another trial because the prosecutor's mishap lay in asking improvidently for a mistrial and the trial judge acquiesced.

Such mishaps may provide an occasional asylum for the guilty. However, the basic approach—to keep the Double Jeopardy Clause firm, and resist erosion by exceptions that seem reasonable but are not necessary—is one that shelters the innocent against the bitter effects of successive prosecutions. Acquittal itself may be of little succor to an accused if he and his family are exhausted by worry and financially ruined in the process of trying the case again and again. And the retrial process may tilt a doubtful case toward conviction.

2. The broad principles of the Double Jeopardy Clause do not provide a specific answer to the question whether the judge properly ordered a mistrial at appellant's prior trial. But they do make it clear that granting a mistrial over the defendant's objection is a decision that should be approached with caution and sensitivity to the values that lie in the balance.

Here the decision that another trial was required followed a brief presentation, perhaps 10 minutes in duration, of a motion made orally the day after summation to the jury. The record does not show what notice, if any, was given to defense counsel that day of the prosecution's intent to seek a mistrial. The prosecutor began by saying the matter "has given me a lot of trouble. I thought about it last night and thought about it." If a transcript had been first obtained, it would have recalled to the judge that on the previous day not

---

\* \* \*
Q. Was there a harsh word spoken between them while you were with them?
A. That would depend on harsh, once again.
Q. Was there a cross word spoken between them?
A. There were firm words spoken in the course of the conversation. I don't know whether you would call them harsh or cross.

4. *First trial.* (Tr. vol. 2, p. 49):
Q. When you first saw Mr. Carsey, he was seated in the Volkswagen?
A. Yes, sir.
Q. What was his condition?
A. Well, he had his head laying over his arms on the steering wheel.
Q. And he was sobbing?
A. When I asked him what the trouble was, he started sobbing.

Q. Would you say he was hysterical?
A. He appeared to be at first, yes, sir.
*Second trial* (Tr. 119):
Q. Now, would you say that in the first statement, or when you first came upon Mr. Carsey, that he was in a hysterical condition?
A. Yes, sir, he was crying and sobbing.
*Third trial.* (Tr. 158):
Q. When you first came up to him he was in a hysterical condition?
A. He was crying and sobbing.
*Fourth trial.* (Tr. 100):
Q. Would you say he was hysterical?
A. He was sobbing and crying.

5. 372 U.S. 734, 736, 83 S.Ct. 1033, 10 L. Ed.2d 100 (1963).

only had he noted that any possible prejudice could be cured by instruction, but also that defense counsel had not yet said that there had been a hung jury. This was likely due to the fact that he was stopped just in time, but he was stopped in time, and it was the prosecutor's rebuttal that contained the only reference to a hung jury.

In resisting the mistrial motion defense counsel reiterated that he had understood the trial judge to grant his request for an instruction that two earlier juries had been unable to agree. The trial judge was emphatic that this request had been denied. The transcript discloses: [6]

THE COURT: I don't advise juries there have been prior trials. They have no right to know that because it could influence them. That is why I denied it.

DEFENSE COUNSEL: In what sense could it influence them, Your Honor?

THE COURT: It is the way that [the prosecutor] stated. There have been two hung juries before; two juries that couldn't agree.

DEFENSE COUNSEL: Does Your Honor recall the conversation that we had on it in Chambers?

THE COURT: Yes, I recall the conversation, but I didn't grant the prayer, and I thought everyone understood, individually.

DEFENSE COUNSEL: My recollection was that you said the first one was granted and there was nothing wrong with that, and then you went to the second or third, and then [the prosecutor]

THE COURT: No, no. I don't know whether I went over them twice or not, but I know my final action was that it was denied. I hate to try this case all over again, but I can see no alternative but to grant the motion.

Bring the jury in.

THE MARSHAL: Yes, sir.

DEFENSE COUNSEL: Would you hear a motion from me as to the mistrial?

THE COURT: It was granted. Now, what do you want to say?

DEFENSE COUNSEL: Well—

THE COURT: Bring the jury in.

DEFENSE COUNSEL: It is the matter that I object.

THE COURT: Oh, certainly. Your objection is noted.

The opinion of this court grants no sharp-practice license to defense attorneys. As the trial court has the best vantage point from which to gauge the prejudicial impact of defense conduct, his decision as to that fact, where made after deliberation and with sensitivity to the competing interests involved, will be entitled to great deference. Cf. Gori v. United States, 367 U.S. 364, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961).

Under the doctrine of necessity, misbehavior by defense counsel that intrudes on a fair trial permits a mistrial without prejudice to a retrial. But there is no evidence whatever of such misbehavior or sharp practice here. Appointed counsel believed that the trial judge had granted his request for an instruction advising the jury that there had been two prior hung juries. This court is not saying that defense counsel was on sound ground, and the course outlined in the last paragraph of its opinion does not provide what defense counsel sought. It can hardly be said, however, that the defense request was so preposterous as to negative good faith.

On the voir dire defense counsel was concerned because reference had been made to the prior trial. He sought to assure that his client would not be prejudiced by a mistaken—but possible, or perhaps even probable—jury inference that the mistrial reflected a conviction that had been reversed on appeal.[7] His

---

6. Tr. 4–5, February 19, 1968.

7. See Tr. 4–4, February 14, 1966.
   DEFENSE COUNSEL: Your Honor, the statement of the one prospective juror

voiced concern that the jury might further think this was "a certain type of case" (see note 7), presumably was an effort to grapple with the problem that the jury might further infer there had been a confession that was held legally impermissible—a concern given added bite by the fact that this court en banc had recently issued *Second Killough*,[8] a decision attended by extensive press coverage. In any event, the judge's subsequent remark at a bench conference gave defense counsel reason to believe that a clarifying charge would be given:

> DEFENSE COUNSEL: I think we had better call to the Court's attention also that [prospective juror] referred to the previous trial in his last—

> COURT: That has already been brought out.

> DEFENSE COUNSEL: I have. Your Honor will explain that to the jury?

> COURT: No, unless you want me to. That is just high-lighting it. The juror said her husband sat on a prior trial. I don't think it makes any difference, but I will be glad to tell them.

> DEFENSE COUNSEL: The only thing is I don't want to look like he has been convicted and on appeal he has beaten the rap. This is the thing—

> COURT: I think the proper time to to take that up is at the charge.

that her husband had served on the case may have several ramifications.

THE COURT: I will excuse that juror.

PROSECUTOR: You have excused her.

THE COURT: What is the trouble?

DEFENSE COUNSEL: I mean with respect to the fact that it is not in the record and before the prospective jury that there has been a previous trial in this case, and I think from the defendant's point of view it might well serve the best interests of both parties if Your Honor were to give something of the background of the case. In other words, there have been previous trials that a jury has never been able to agree.

THE COURT: You don't want to go into that, do you?

DEFENSE COUNSEL: There could be some prejudice to the defendant if this was thought to be a certain type of case.

These trial references provide a context both for defense counsel's request and his mistake in supposing the request had been granted. This record reflects the good faith of appointed defense counsel—a former prosecutor—in attempting to protect his client, and provides no basis for any characterization of his conduct before the jury as "questionable." This court's opinion in no way condones chicanery by defense counsel. It places a premium on care and deliberation before a prosecution's motion for mistrial is either made or granted.

TAMM, Circuit Judge (dissenting).

The majority opinion orders the dismissal of all charges against this appellant despite the fact that a jury of his peers, in a fourth trial of his case, found him guilty of murder in the second degree after a fair trial which, from the record before us, was conducted without error. Appellant's challenge is to the mistrial declared in terminating his third trial, and it is to that event that the majority address their attention and upon which they predicate their reversal.

The factual situation, which the majority opinion interprets as constituting double jeopardy,[1] is simple to describe. In his closing argument to the jury hearing the third trial of this appellant, de-

8. Killough v. United States, 119 U.S.App. D.C. 10, 336 F.2d 929 (1964). Suppression of a confession led to the discharge of an admitted murderer.

1. AMENDMENT V.

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

fense counsel, himself a seasoned and experienced former prosecutor on the staff of the United States Attorney, told the jury that " * * * the two previous trials have ended in mistrials." Subsequently, the Assistant United States Attorney prosecuting the case moved for a mistrial, and over defense counsel's objection the learned trial judge granted this motion, resulting in the ultimate retrial in which appellant was found guilty. In declaring the mistrial, the judge specifically found that appellant's counsel's statement was "prejudicial," and of course the prejudice was against the Government.

My brethren of the majority say that appellant's counsel's announcement to the jury that there had been two prior mistrials in this case did not constitute adequate justification for the trial court's declaration of a mistrial, and herein is the basis of my disagreement with them. I am convinced that if the prosecutor had made the identical statement to the jury in an obvious attempt to influence the jurors' thinking, we would, without any doubt or difficulty, rule that the statement was prejudicial to the defendant's right to a fair trial and consequently a proper basis for a mistrial. I am unable, then, to evaluate the questioned statement as being permissible if made by defendant's counsel but highly irregular if made by the prosecutor. The record discloses that the prosecutor, prior to the trial judge's ruling upon his motion for a mistrial, requested the court to authorize him, in lieu of granting the mistrial, to advise the then sitting jury that the first jury hearing appellant's case "stood 11 to 1" for conviction. I think it is obvious that if such a statement had been authorized and made, we would have summarily reversed the case.

We have established a very high standard of propriety for prosecutors in our courts:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed he should do so. But, while he may strike hard blows, *he is not at liberty to strike foul ones.* It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use *every legitimate means* to bring about a just one. Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). (Emphasis supplied.)

It is my view that we should require defense counsel to conform to the same standard of conduct as we have established for Government counsel, because he, too, is the servant of the law, charged with seeing that justice is done. While defense counsel's objectives and function differ from that of the prosecutor, the law should demand of each the same fidelity to standards of ethical conduct. As an officer of the court, he must perform his duty of defending within and not outside the canons of ethics, honorably and not by chicane, trickery, or deceit.

It is obvious that when appellant's trial counsel, in his closing plea to the jury, advised the jury of two prior mistrials he did it deliberately for the purpose of creating doubt of the defendant's guilt in the minds of the jurors who, understandably, would ask themselves whether a reasonable doubt of guilt had not been established when two prior juries, upon the same evidence, had been unable to reach a verdict. There is no question in my mind but that if the prosecutor had made the same statement to the jury for the purpose of injecting into their thinking a fact completely outside of the evidence before them, we would label it as both a "foul blow" and an "improper method calculated to produce a

wrongful conviction." I am unwilling and unable to agree that the questioned statement herein was proper when made by defense counsel when it so obviously would have been improper if made by Government counsel. The statement would have been adequate and proper basis for the granting of a mistrial if the prosecutor had made it, and I must conclude that it was proper and adequate for the trial judge's action when it was made by defense counsel. Defense counsel's initial statement created and triggered the factual situation resulting in the mistrial, despite the majority's feeble attempt to transfer the responsibility to the prosecuting attorney.

Despite the attempt of the majority to equate a defendant's constitutional right of appeal, his right to "due process of law," and his right not to be "twice put in jeopardy" to some unidentified right of his trial counsel to engage in highly questionable conduct before the jury, I remain convinced that the factual situation herein presented created a situation in which the United States, representing the law-abiding people of the community, is deprived of its unarticulated right to due process of law. Until we recognize that the United States, too, is entitled to all the benefits of a fair trial, we are affirmatively contributing to the general breakdown of effective law enforcement.

The majority opinion places a premium on chicanery and invites defense counsel to engage in it by its "you cannot lose" result. If this opinion is to prevail, defense counsel may resort to trickery in the court room secure in the knowledge that if he gets by with it he will have the benefit of his misconduct, and if he does not a mistrial will be declared and thereby he reaps an even greater reward for his unethical behavior. This case now effectuates the release of the appellant, despite the fact that a jury has found him guilty of a brutal murder. It does so by stretching the immunity from the double jeopardy provision of the fifth amendment to embrace a factual situation far beyond the purpose and reasoning of the Founding Fathers.

In the words of William H. Taft, speaking before he ever became Chief Justice:

\* \* \* The \* \* \* disposition on the part of the courts to think that every provision of every rule of law in favor of the defendant is one to be strictly enforced, and even widened in its effect in the interest of the liberty of the citizen, has led courts of appeal to a degree of refinement in upholding technicalities in favor of defendants, and in reversing convictions that render one who has had practical knowledge of the trial of criminal cases most impatient.

When a court of highest authority in this country thus interposes a bare tecnicality between a defendant and his just conviction, it is not too much to charge some of the laxity in our administration of the criminal law to a proneness on the part of courts of last resort to find error and to reverse judgments of conviction. Taft, The Administration of Criminal Law, 15 Yale L.J. 1, 15 (1905), as quoted by Mr. Justice Frankfurter, dissenting in Stewart v. United States, 366 U.S. 1, 21 [81 S.Ct. 941, 6 L.Ed.2d 84] (1960).

I would affirm.